Immature athletics long predated the NCAA's founding in 1905 for the purpose of extending to intercollegiate sports its defining principle, that athletes not be paid. In the ensuing 110 years, the Association has adhered to its foundational rules that student athletes pursue their education and that they receive no remuneration other than for the purpose of reimbursing the expenses of doing so. Until the decision below, no court had ever found that the antitrust laws condemn a rule whose purpose and design is to protect amateurism. Even before the Supreme Court set out its framework in Board of Regents, the courts uniformly recognized that the antitrust law does not constrain such rules. Now in this case, although not in others that they have brought, the class argues that it is not attacking the prohibit pay for play. But that is precisely what they are doing. There is no NCAA rule dealing with nil rights. Plaintiff's objection is to the rules that bar all forms of pay and thus preserve amateurism in college sports. Now the district court agreed that rules that protect amateurism are justified, but it nonetheless found a Sherman Act violation because the court believed that amateurism could be maintained through a supposed less restrictive alternative. But the court made that determination only by redefining amateurism, discarding the central principle that the athlete, as Board of Regents put it, quote, must not be paid in favor of a new rule that student-athletes can be paid a modest amount, whatever that is. So why not permit schools to pay $8,000 a year? Is the NCAA now only challenging that portion of the judge's rule that goes to the $5,000 in trust? No, we challenge both portions of the rule, although for somewhat different reasons. But the prior rule wouldn't seem to fit the criteria that you've just described, because it's related to the expenses of attending school. So yes, Your Honor. So first of all, I think we're here appealing an injunction, and prior to the time that the court ruled, the NCAA had been considering a request from several of its conferences to raise the level of reimbursement of reasonable expenses from what's referred to as GIA to what is referred to as the cost of attendance. And it agreed that it would permit its schools to do so. So in any event, there is no warrant for the court's imposition of an injunction. But in any event, even if... Is that portion of the district court's ruling moot? No, it's not, because the district court's ruling, and this is the court's error, the district court's ruling that the NCAA not prohibit a preclusion of a sharing a specific commercial revenue stream, assuming hypothetically that one existed. That is, the stream of revenue that the schools receive for the so-called NIL rights of the athletes. It is inconsistent with rules of principles of amateurism, and here I'm not only speaking about the NCAA's rules, but as the record in this case reflects the rules of every other amateur sports organization that either party identified, that athletes may not be paid a specific share of a dedicated commercial revenue stream. So if this were a challenge, I think that I can sort of summarize my answer. If this were a challenge just flat out to a rule that said, you aren't paying the full amount of the reasonable expenses of attending college, and the payment of the full amount of reasonable expenses of attending college is not inconsistent with the principle of amateurism as you address it, we would have a different case, and we would have to defend that under a rule of reason, or at least I think that's what we would have to do. But this is a situation in which a judge has said, no, the athletes must be allowed to share in a specific commercial revenue stream that derives from their participation in sports, and that is not what amateurs do. That is what professionals do. Can you explain to us, though, however, how the NCAA rule differs from what the injunction the respect? Right. So the NCAA rule doesn't permit athletes to receive, to be paid to play. That is, to receive money that is, you know, derived. I understand that. I understand your argument, but how, in a practical sense, how does it differ if the full cost of going to school is allowed to be given as a grant now by the NCAA? Well, the full cost, what constitutes reasonable expenses is a judgment for the NCAA, the association of 1,100 educational institutions to make, not for a judge, a federal antitrust judge to decide, well, I think it's X, I think it's Y. So the simple difference is it's permissive versus mandatory? It's permissible for the association, given the, quote, ample latitude that the Supreme Court has said it has to have in the maintenance of the preservation of the tradition of amateurism, to define the level of reasonable compensation for reasonable expenses. So is it your understanding the district court has taken upon itself the task of defining what constitutes reasonable expenses? It is. That would be enforced in future proceedings? Well, it not only would be enforced in future proceedings, Judge Bybee, but I dare say that the next case will come along and say, well, you know, laundry expenses are now included, but travel expenses aren't included, and we think that travel expenses are a reasonable cost. Is the NCAA's current rule concerning COA, is that, that's not mandatory on the schools, that is permissive for the schools to go up to that amount, but they don't have to, is that correct? Yes. And does the district court's rule mandate that schools pay that? No. No, the district court simply says that the NCAA cannot have a rule that proscribes... The district court's rule, then, is very similar to the NCAA's rule, although the interpretation as to what constitutes COA may differ. That's right. And I think, you know, as a thought exercise, think of what would happen, let's assume, I hope this doesn't come to bear, but let's assume that you agree, this court agrees, and perhaps the Supreme Court agrees that, well, because we're allowing scholarships up to a certain amount, you know, that the NCAA hasn't convinced us that, you know, it is preserving amateurism as amateurism was originally defined. So the NCAA goes back and says, you know what, we really do care about this, we are trying to preserve the sport, which is, after all, what this is about, as amateur athletics, and so we are simply going to require the Division III model or the Ivy League model of all schools. That is, students get in, we can try to recruit athletes, but no one gets any athletic scholarships. You get scholarships based on need if the school has sufficient resources to provide it. Under the plaintiff's theory in this case, and I think under the district judge's rationale, that would be a violation of the antitrust laws, because, you know, why not provide them all the reasonable expenses of going to college? The point is that this is a product, it's a game. I think no one would contend that if the NCAA just decided that we are not going to offer athletic scholarships, which is the rule that existed in 1906 when the rules were first permitted, and instead we are simply going to endorse the rules that we have for Division III, that that would be a violation of the antitrust laws. It can't be the role of an antitrust court to essentially redefine the rules of eligibility that define the nature of the league, which permit reimbursement of expenses as the league defines what expenses can be reimbursed. There are amateur leagues where no expenses are reimbursed. You come and you buy your own sneakers and you pay your own way to the game. But in no amateur sport, in no amateur league that the record reflects in this case, or I dare say that exists, are athletes permitted to be paid to play, either in the form of a share of commercial publicity rights to the extent that they exist in this case, and we think they don't, or let's say somebody said, well, what's wrong with the school saying, well, everybody will get $100 per tackle, or $500 per touchdown, or to make it not permitted by the NCAA's rules. And the notion that an antitrust court would say, I don't really see how that violates the rules of amateurism. It just doesn't compute. This is what we're talking about here is a product, amateur athletics, as I said, that the NCAA didn't invent, but was created for the purpose of applying to intercollegiate athletics in light of a regime, as is counted in the record in the briefs, in which some schools were paying athletes to play, or allowing professors to play, or whoever would sort of win the game and recruit athletes away from other schools. The point of creating the NCAA was to create and preserve the model of amateur athletics. And as the Board of Regents, as the Supreme Court and Board of Regents said, and as at least three circuits have adopted, when a rule of the NCAA is challenged, the first, as the Seventh Circuit said, the first and perhaps the only question to be asked, and I'm quoting from footnote seven of Agnew, is, quote, whether a rule on its face is supportive of the no-payment or student-athlete model. And on that basis, the Third Circuit in Smith, the Fifth Circuit in McCormick, and a number of district courts have dismissed, at the motion to dismiss stage, antitrust Sherman Act challenges to rules that were manifestly on their face designed to preserve the model of amateurism. And that's what we have here. This is not a, this case doesn't involve a question, and it is not within the authority. Your rules in Smith and McCormick were really quite different from this. The question of whether you've got a fifth year of eligibility or another year of eligibility to transfer is very different from a rule, from rules that govern scholarships. And it's clear that you've got financial transactions going on here that are of great importance to both sides. Well, what we're talking about here is not a rule that involves scholarships. We're talking about a rule regarding eligibility. And McCormick, by the way, was a rule involving conduct of, I think it was Southern Methodist, applying some sort of excessive or providing excessive revenue of some sort, the opinion doesn't say, to the athletes. That was the death penalty for SMU. That was a boundary maintenance question for the NCAA by an institution that didn't have anything to do with the individual players. Well, no, the institution, that is the university, was providing compensation to athletes above the NCAA's rules, above the joint venture's rules about what it means to be an amateur. It didn't involve this particular rule. But the inquiry that the Supreme Court laid out in Board of Regents is, when there is a challenge to an NCAA rule, you ask, the first question is, is this a rule that is in the mold of rules that define the eligibility of the participants? If the answer is no, as it wasn't in Board of Regents because it involved an ancillary rule about the level of television broadcasting expenses, then you go to full rule of reason analysis. But if it does fit in the same mold, as do rules defining the eligibility of participants, it is lawful as a matter of law, and as the court subsequently stated in American Needle, rules like this can be affirmed in the twinkling of an eye. This is not a question, Judge Bybee, of whether this is really a rule that fits in the same mold as the rules that the Supreme Court was talking about in Board of Regents. This is the molten core of the rule. This says, this is a rule that simply says, in the product that we have, athletes cannot be paid. And we define what pay constitutes. And as the Supreme Court said, there is no question, there should be no question, that the NCAA should have ample latitude in performing the critical role in the maintenance of a revered tradition of amateur sports, and that preservation of that product, quote, is entirely consistent with the Sherman Act. What we're talking about here is a rule designed to maintain athletics in a higher education setting, tethered to higher education values that educate students who might otherwise not have access to this education. And those are substantial values that the Supreme Court has said deserve very substantial deference. And that's really what's at issue in this case. Now, I do want to, I mean, we've articulated a lot of other reasons why we think that the district judge erred in this case, but I would like to just spend a few minutes on an analysis that she engaged in. Because even if you agree with us, if you disagree with us, that a quick look will reveal the only question that has to be answered, which is this, is this a rule that fits in the same mold as rules defining the eligibility of participants? She erred, with all due respect, the district court erred on all three steps of the rule of in this court and the Supreme Court. To be valid, a restraint need only be reasonably necessary to achieve the pro-competitive end. So the inquiry is not whether her rule was reasonable. The question is whether the NCAA's rule of no pay for play, none, is so inconsistent with its objective of familiar three or four step process. The first step requires the plaintiffs to show that there are significant anti-competitive harms. The court erred in finding that there are no anti-competitive harms, significant or not, that are demonstrated in the record in this case. In the first place, as our brief points out, student athletes would not be paid for nil rights absent the rules because there are no such thing as nil rights in broadcast games, and they have no authority. The record shows that nil rights are referred to in various contracts. Now, that may be a matter of sort of defense on both sides. That is, it may be a point that the sides are saying, we don't know whether these rights actually exist at law because that's a complicated question, but we're going to account for them anyway just in case. That doesn't mean they don't have value. The value may not have been established yet by law, but the fact that the parties are contracting about them may indicate that they have some value. Judge Bybee, it is the plaintiff's burden at this stage of the rule of reason process to prove that there is a substantial, a significant anti-competitive harm, that it exists, and this Court's precedents reinforce the principle that speculative harms that may or may not exist are not substantial harms that the antitrust laws care about. There is no jurisdiction, there is no state in the United States that permits the enforcement or that recognizes the enforcement of rights of publicity in events of public interest, including athletic contests or rebroadcasts of athletic contests. I grant you that point, but how do you deal with video games? Post Keller, how do you deal with video games? Obviously, I dissented in Keller. I agree with your position, but that's the law of the circuit, and now there are rights of publicity that have been recognized in video games, and we know that from the Keller case that those are very lucrative. Okay, so the reason that they would receive nothing in video games is twofold. First of all, as the briefs explain, and we've cited the Court to the portions of the record, the NCAA always had a rule that precluded any of its licensees from making any use of the name, image, and likeness of athletes. That was expressed. That was an express provision of the contract with Electronic Arts that you addressed in the Keller case. When Electronic Arts started to find ways to make it much easier for people who wanted to play the game to identify an avatar with a particular player, the record shows that the NCAA became very concerned and, in fact, refused to renew the contract because it believed, although EA disagreed, that it was violating the letter of the condition of the license, and so there is no longer any such thing. But it's far from speculative on the district court's part to say that could change on a dime. There's a reasonable prospect of future harm. Let me just make one point and then go to the least restrictive alternative, if I may. The standard for the issuance of an antitrust injunction, that is the remedy that she applied in this case, there are no damages sought in this particular case, is, and I'm quoting from the Supreme Court's decision in Zenith, whether there is a, quote, significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation that is likely to If there ever were a day, and I can assure the court that there will not be, in which the NCAA decides to cast aside its rule that its athletes not be commercially exploited and chooses to reengage with any sort of video game in a way that permits the name, image, and likeness of the athlete to be displayed, that will be another case. And Your Honor is absolutely right. Under this that's many state laws recognized, but there is no such thing here, and there is no substantial, significant threat of injury from an impending violation in that regard. If I may, I'd just like to spend a few minutes on the third prong of the rule of reason analysis, which I think is really where the court, again, with all due respect, erred the most. Her least restrictive alternative ruling is erroneous as a matter of law because it is entirely clear, and, you know, the authorities at our brief sites and also Professor Hovenkamp and the other antitrust scholars that have filed on our behalf explain, a least restrictive alternative does not include setting an incrementally different cap price. The antitrust laws are not concerned with setting different prices, and, therefore, the fact that the district court found that if you just raise the level of compensation a little higher, that would be a less restrictive alternative is simply not an exercise that antitrust courts can engage in. It also, this less restrictive alternative, is also not, as the standard requires, virtually as effective. Let's go back to the question I asked you up front. Doesn't that really go just to the $5,000 in trust question as opposed to the COA? No, it doesn't. Right now, I mean, the point is, let's assume that the NCAA didn't have a rule that said schools can go up to COA if they want. That is, the rule that existed before this is not the job, it is not the mission, it is not within the scope of authority of an antitrust court to say, well, you know, right now you have GIA, that is tuition, fees, room, board, and school books. I don't think it would be inconsistent with amateurism to pay laundry money. And that's a less restrictive alternative. There is no case ever decided under the Sherman Act by any court that has ever upheld that kind of raising of a price cap as a less restrictive alternative. A less restrictive alternative is an alternative way that is qualitatively different, not incrementally different. And the fact, the reason that it's not incrementally different is that in order to make the initial showing that there's an antitrust violation, you have to show that there is a significant harm. And the less restrictive rule has to be, quote, substantially less restrictive of competition. Now, the court also erred in another respect, which is what the antitrust laws protect is competition, not competitors. And there is no showing in this record that there would be any more competition among schools if the cap were raised, let's say, from hypothetically from GIA to COA or from COA to the $5,000 trust fund. The NCAA's rule doesn't mandate that schools pay that. It simply permits them to do that if they wish. Exactly. So if a school has announced that it's only going to offer GIA and another school in the same conference offers COA, there surely will be some more effective competitions. And we would expect athletes to move from one school to another. Of course, just as not every school is required. Let's go back to the ANSIEN regime. Schools were not required to offer GIA. And they all didn't offer GIA. And they didn't offer GIA to all of their recruited athletes. And they competed on that basis. Now, they also competed, as the district court found, on any number of non-price bases. We have better professors. We have better dorms. We have better training facilities. We have better coaches. All that, the whole bundle of compensation that went in this transaction. And there is zero showing in the record that the price of the bundle, even if we were talking about protecting competitors and not competition, that the price of the whole bundle would change if they could go up to whatever it is, GIA plus something or COA plus something. It's simply setting the cap. And that, in and of itself, doesn't mean that there will be more competition. Judge Feibe, as to your point, all of the NCAA's rules are permissive up to the prohibition. And the schools can, and the district court found, do vigorously compete on that basis. I know my time is up. So I think I should probably sit down. Very good. Thank you. Good afternoon, Your Honors. In responding to the NCAA's argument, there are certain fundamentals. The first is that the NCAA overstates and misinterprets the Board of Regents' decision. There are certain truths in the Board of Regents which the NCAA ignores. First and foremost, they lost. The district court in Board of Regents below found that the NCAA was a classic cartel. The Supreme Court affirmed they were a horizontal combination of competitors restraining the freedom of its members to compete. They were an enterprise organized to maximize revenue in a commercial venture. It was a business where neither its affiliation with educational institutions nor good motives protected it against antitrust accountability. Amateurism was not a defense. There were no findings of fact by the district court on either amateurism or athletes. There were no findings affirmed or reviewed by the Supreme Court on amateurism as a pro-competitive justification. There was a failure. Yes, counsel, but much of that is because of the nature of the contract that was at issue there which had to do with TV rights. Exactly. It didn't really deal with individual athletes as you've got the claim here. Yes, and that's the problem of what they're trying to extrapolate or leverage Board of Regents to have this court read. That Board of Regents has somehow established an irrebuttable, impregnable determination that no rule in any way encompassing the rubric of amateurism can be challenged and that's not what Board of Regents stands for. The passing language in the Board of Regents regarding pay in students was neither necessary, as your Honor just said, nor relevant to the outcome of the judgment. It was dicta. And as the NCAA said in the Rock case where they tried to distinguish language in the Agnew case that was not necessary to the judgment, they said the panel's discussion of a hypothetical labor market was dicta as it was not necessary to the outcome of the case and therefore not entitled to the full weight usually given judicial decisions. The Supreme Court itself has defined dicta in the following way. If the court once in dicta called a tomato a vegetable, is it bound to deny that it is a fruit forever? No. So the Board of Regents does not establish any absolute, abstract, blanket, mechanical immunity from the antitrust accountability for any NCAA rule or practice. In fact, the very cases cited by the NCAA, Agnew, McCormick and Gaines said even eligibility rules and NCAA bylaws are subject to antitrust scrutiny. And what is the nature of that scrutiny as a fundamental truth of the Board of Regents? Both the per se rules and the rule of reason are employed to form a judgment about the competitive significance of the restraint. What the NCAA argues in this case is by invoking the talismanic language or word of amateurism that this court cannot form a judgment because that judgment has already been made. And the Supreme Court and Board of Regents said whether the ultimate finding is the product of a presumption or a market analysis, the essential inquiry remains the same, whether or not the challenged restraint enhances competition. The NCAA today has not addressed the issue of the non-enhancing or enhancing competitive effects of the restraint. This court touched on the issue in the Keller case. In footnotes 5 and 9, the court expressed concern about whether the structure of the NCAA is fair to the athlete. And structure is exactly what the NCAA itself and antitrust terms addressed years ago. One of the longest tenured senior officials of the NCAA in advising the incoming President Emmerich said as follows, the public would generally agree that the growth of intercollegiate sports has taken place at the expense of the college athlete whose participation is exploited to make another buck for a bigger stadium, the coaches, the administrators, or for other teams who can't pay their own way. It is a fairness issue. And along with the notion that athletes are students is the great hypocrisy of intercollegiate athletics. Well, what in the structure of the NCAA is responsible for that hypocrisy and that unfairness? The NCAA itself commented that the structure constrains the competitive relationship among the members. It imposes a one size fits all approach which forces the entire membership to a level of the lowest common denominator. During the course of the litigation, the big wrote, we represent the teams that have the highest revenue and the most nationally known athletes, but we do not have the ability to control our own destiny to build a regulatory structure that respects the demands on athletes in the 21st century. Under the structure of the NCAA, they wrote, efforts to improve the benefits to athletes have been deflected because of cost implications manageable by our institutions, but not by institutions with less resources. There is a binding constraint within the membership imposed by the structure of the NCAA and the rules themselves, which essentially reduces competition between the members to the level of the most inefficient or the least efficient competitor. That's the antithesis of the antitrust laws. At the end of the day, though, we're talking about essentially the value of the names, likenesses, and images of the players. That concept is brought into the antitrust injury portion of this and also into the rule of reason. Explain to me why you think the names, likenesses, and images have value in the antitrust sense. The names, images, and likenesses of the athletes have value because there are commercial enterprises that are willing to pay for them and because the NCAA commercializes them. Well, to pare down, first, I think you'll agree that in terms of live broadcasts, no court has recognized property rights in the names, likenesses, and images. True. It has not been tested, yes, but in all instances, every contract involving a live broadcast includes the request by the broadcaster to receive the rights of the names, images, and likenesses. I acknowledge that point. I'm just saying that right now, those rights have not been acknowledged by any court. True. As to the third, which is the archival footage, there are restrictions in place already that that prevents those likenesses from being used without consent. True. I can't answer that yes or no because there's the essence of the copyright assertion with regard to archival material that a former athlete cannot say, I have a right for you to get to give me compensation for the use of that. So then we get down to video games and obviously with our Keller decision that has opened the pathway for compensation, but can you give me a reasonable likelihood, given the stance of the uncontested rules of force of the NCAA, that has value in the current market or the reasonably foreseeable market? That one, Your Honor, really is easy for me to say yes. The head of EA, the principal maker of the names, I would publish the game. And the only reason that they're not publishing the game is because the NCAA withdrew it because it didn't want the athletes to then have a share of that. True. So it's kind of backwards. For other reasons, but the NCAA prohibits it. But what concerns me is those rules are not in play in this litigation, are they? Those prohibitions? Those are unchallenged, right? No, Your Honor. If I can, I will get to the concept of amateurism and the alleged principle of amateurism being that athletes cannot be paid. But if we get to the restraint, because the restraint... No, I'm just talking about the current restrictions. I'm not talking about the philosophy. Right. But the current restrictions basically form the basis for the binding constraint, and that is the schools will not compete with each other with regard to the recruitment of these athletes. That binding constraint either increases the cost to the athlete of attendance and performance or decreases the value of the athlete's athletic skills. Either way, that's an agreement not to compete on price. And there is no court that has held that an agreement not to compete on price in a relevant market, which this court made findings of, is not an antitrust violation. It is an antitrust effect, whether viewed as a monopoly or a monopsony. It either increases the cost to the athletes of attendance at school and performance or decreases the economic value of the athletes. Well, I agree with you. There's a huge potential market out there. The EA litigation proved that. But if we're talking about antitrust injury at the moment, how far can we go in saying that that market, which really doesn't exist right now because of the NCAA rules, which aren't being challenged here, has value in the present context? But they are being challenged, Your Honor, because the issue is not whether or not the athlete is paid in NIL. It's whether or not that NIL can be used in the value of competition between schools at the present time, which don't compete on price, to increase the price of the value of either the athlete's services or decrease the cost of the scholarship. There was no direct correlation ever entered into by the district corporal to say every athlete is entitled to X dollars for an NIL. They said the NIL is one precluded or constrained from competing with regard to acquiring or in the exchange of the educational services for the athletic performance and the athlete in exchange for their performance for the opportunity both to get an education and participate in intercollegiate reverse the present position of the NCAA structure, which prohibits the member schools from competing with each other on price. And that gets us to amateurism. Let me ask a question. Yes. One of the amicus parties said that what the district court did was start a race to the bottom. In other words, just opening it up. Who's to say that $5,000 or $6,000 or $10,000, whether put in trust or not, as this particular judge did, $5,000, who's to say that it's going to stop there? And the appellate makes the argument very effectively here today, and you are effective too, makes the argument this is not a federal judge's job to run the NCAA to determine how much money is to be paid for particular athletes. Where are you going to stop? You're going to stop with college? You're going to go to high school? There are high school athletes that get a lot of recognition. They usually go to Michigan or Michigan State. Some do. There are some other schools as well that athletes choose to go to. But that is the essence, Your Honor, of the district court's opinion. It was prohibitory in nature. It did not set an amount. It did set an amount, but it set a top limit. No. It said, at this point, given the evidence in the record, evidence provided by the defendant's own witnesses, their own witnesses who said, you're right. I mean, amateurism is a floating word with no anchored meaning. And sure, nothing would change with regard to amateurism, even in the abstract, if there was an additional up to $5,000 that individual schools could compete with each other for the services of the athlete. And it was the evidence produced by the NCAA's witnesses themselves who said, of course, we could go up to cost of attendance without violating the present interpretive application or implementation of that rule, which gets us to, is there really a core, consistent principle of amateurism? There is, but it's not a rule. The principle of amateurism says, you are, an athlete is a student, first and foremost. That's not what the evidence, unfortunately, said. The evidence said that the principle of amateurism has nothing to do with compensation. It has everything to do about motivation. And with regard to that motivation, contrary to what was just said by the NCAA, it doesn't mention pay at all. In fact, the first rule of the Big Ten, Your Honor, was that Big Ten schools could only play three professionals at a time. And the district court made findings that the historical record that the NCAA cites as evidence of its longstanding commitment to amateurism is unpersuasive. The record reveals that the NCAA has revised its rules governing athlete compensation numerous times over the years, sometimes in significant and contradictory ways. Why? Because pay has no meaning other than what the NCAA says it is. So you can't be in violation of a rule or not, because you never know what the rule is, because the rule is only what they say it is. At one time, the rule was no scholarships, because scholarships were paid. Then they reversed that. And in fact, scholarships were deliberately included because Walter Byers in the 1950s said, we have to stop this competition among schools in under-the-table payments to athletes. So we're all going to agree that there will be a lowest common denominator. Nobody competes for these athletes above the cost of a grant and aid. That itself was turning a no-pay rule into a pay rule, but because there was agreement among the competitors to impose a binding constraint on the level of competition for that pay. The court also noted that... I'm not judged by that. Yes. Counsel, your point is well made that there's been, there certainly has been a shift in philosophy, but it seems to me that there's a reasonable rule to be drawn that the cost, at least up to the cost of education, there's some relationship to the goods and services that you're receiving at the university, and therefore there's something that doesn't violate a theoretical notion of amateurism. Once we get to the question of putting $5,000 per year in trust for athletes that would be a cash award at the end of their time at the university, it looks to me like we've the line was not clearly drawn, but at least it crosses some theoretical line about pay for play, but why isn't that portion of the district court's order infirm? Because the defendant's own witnesses said an additional $5,000 or the provision of greater economic benefits. As the big five conferences said, in order to respond to the needs and the $5,000 doesn't cross whatever that amorphous, ethereal definition of amateurism is. It does not in any way, which witness said that, that was Dr. Rubenfeld with regard to the athletic director for Stanford, who said there'd be numbers from six figures to seven figures. But I think that testimony was that wouldn't be troubled by $5,000, which is far from an economic assertion. And I don't think he was talking about what would make people amateurs. I thought that was quite a different context. And that's the difficulty of dealing with the term amateur without a definition other than amateur as the principle is defined by the NCAA is the motivation of the athlete. They're supposed to be students. That's the amateur. They're supposed to be in college. They're supposed to be legitimately enrolled, legitimately taking classes. They should not be athletes masquerading as students. Yeah. Your suit didn't originally ask for $5,000. That figure sort of evolved out of a couple of witnesses who threw out a $5,000 figure that didn't seem to have any bearing to anything. You're not asking this court to go anything above what the district court order. In other words, you're only defending the district court's order and not suggesting to us that we should either uncap it or that we should cap it at a higher place. Correct. And so with regard to this immutable principle of amateurism, the court found that the inconsistencies in the definition and application, and pay for one thing, pay one day, and not the next day, was not indicative of any core principle. Then the court addressed the indefinable definition of amateurism. Amateurism differs or amateur differs by division and by sport. For example, a tennis player is authorized to make up to $10,000 without violating the principle of amateurism. Why? Where's the rationale for that? What distinguishes tennis from football or swimming or basketball? Rather than evincing the association's adherence to a set core, the history the court found shows how malleable the NCAA's definition of amateurism has been since its founding. In fact, the principle of amateurism, as contained in the NCAA Constitution, says it's all about motivation. And this conception, the court noted, stand in stark contrast to the definition set forth in the NCAA's early bylaws, where education was not even a recognized motivation for amateur athletes during the years when the NCAA prohibited athletic scholarships. But probably the best illustration of the nonsensical nature or the hamster wheel application of the definition of amateurism was the following exchange with President Emmerich. You say the definition of amateurism in your testimony was you're not paid, right? Yes. Okay. We've looked at the Constitution. We've looked at the rules. We've looked at what your lawyers have said to the Court of Appeals. Does it all boil down to just amateurism being you're not paid? That's the most significant part of it. Is there any definition of amateurism in the NCAA Constitution or bylaws that amateurism means you don't get paid? I believe that's the intention of the language that we've been talking about all along. So it's not written down expressly in any NCAA rule or bylaw. That's the definition of amateurism, he was asked. That's your interpretation of the intent of those rules. President Emmerich, it's the interpretation of everybody who's been a part of the NCAA for 100 years. That was not supported by the record. And in fact, it was contradicted by the record, where the immediate predecessor said, when it comes to can the NCAA legally pay the athletes, he said at SER 437, which is in the 2006 State of the Association speech, I presume it could be resolved if we wanted to compensate participants. Where is the immutable principle? They themselves said, if we want to pay the athletes, we can. Pay is not the anchor of amateurism. The motivation is supposed to be as reflected in the principle. And in fact, they went on to say that we have problems and challenges around things like the how we establish it and how we don't. We are not necessarily of one mind as to what amateurism means. It's very difficult to deal with something that's that ethereal and say it means one thing, when in fact, the record findings are not to support that interpretation. And the NCAA here was presented with an unprecedented opportunity. With five years of discovery, hundreds of exhibits, dozens of witnesses, including one Nobel Prize winner, three weeks of trial, they had a unique chance to demonstrate as a matter of fact that there were viable, legitimate, substantial pro-competitive benefits outweighing the significant trade restraints alleged by the athletes in this litigation. And in fact, they admit so. They say the record established that there were significant pro-competitive benefits. That involves two findings of fact. One, that there was or were pro-competitive benefits. And two, that those pro-competitive benefits were significant. The district court made extensive findings rejecting that proposition. In fact, the court found as a matter of fact, with regard to the specific restraints alleged, that the pro-competitive justifications of amateurism and integration of education and athletics, as proffered by the NCAA, were unpersuasive, implausible, non-credible, unjustified, flawed, insufficient, limited, and marginal. Not a testament to the viability of either their significance or their pro-competitive benefit. The court, however, noted that there may be a continuum with regard to the pro-competitive benefits that the court found could be in play. And the court said that there may be some level of large payments that could result in a decline in the popularity of intercollegiate athletics or assist, enhance, in the integration of athletics and academics. But, she said, you're not there right now. The court could have ended its inquiry at that point, just as the court in law did, because there were insufficient pro-competitive justifications to respond to the significant restraints in competition derived from the agreements not to compete on price for the athlete in recruitment. So, she gave the benefit of the failure of the evidence to the NCAA and said, okay, you've raised a suggestion or an inference that at further point in the continuum, there may be a pro-competitive benefit that would outweigh the present restraint. There is not one now, but there could be. So, in an abundance of caution, in an abundance of the benefit of the doubt, in a belt and suspender, I'm going to look at whether or not there's a less restrictive alternative that would achieve the same objectives. And the court did that, thoroughly consistent with the absolute traditional classic application of a rule of reason and analysis, and looked to see whether there were less restrictive means of achieving exactly the same objectives and benefits, but one that would permit significant competition among the member schools. How do you respond to the argument that least restrictive means analysis is a qualitative and not a quantitative analysis? I think the court did a qualitative analysis. They looked to see what was the objective sought to be achieved, and could you achieve that objective with a less restrictive means, given the fact that you already failed to prove that your presently professed pro-competitive benefits did not justify the actual restraint being challenged. So, the court looked prospectively. Was there something in the future that could lead to a pro-competitive benefit? Right. But you have to agree that at least as to the grants and aid versus the cost of attendance, that's more of a quantitative rather than a qualitative analysis. How much in grants? In principle, no, Your Honor, because cost of attendance differs from school to school. So, it's not quantitative in the sense that I'm saying $20,000 for University of Tennessee would match the $35,000 for the cost of attendance, for example, at the University of Michigan. It was not quantitative. It was qualitative. It dealt with the cost of attending school, which differs from school to school, and the court's decision did not limit or tie itself to any one amount. My questions are taking you over time. Do you have any summary remarks you want to make? Yes, Your Honor. Most recently, on remand to the district court on the Board of Regents, the court took pains to point out the recalcitrance of the NCAA in responding to the decision of the Supreme Court. And the court said in that remand, it would serve no purpose to repeat the egregious conduct which the court found to exist. And by my permanent injunction, just like the injunction entered here, I did not seek to prohibit the NCAA from openly and competitively participating in the collegiate market. What the court does prohibit is the illegal activity pursued by the its own interests. We believe the same occurred here. And in fact, most recently, the Supreme Court commented in the North Carolina Board of Dental Examiners that active market participants cannot be allowed to regulate their own markets free from antitrust accountability, that the prohibitions against anti-competitive self-regulation by active market participants are an axiom of federal antitrust policy. And just as Judge Browning expressed here, the nature and purpose of the antitrust laws is to guard against predatory conduct that has no redeeming competitive virtue. And the court made extensive findings repeatedly that the significant trade restraints, the agreements not to compete in the recruitment of athletes, was a predatory conduct void of any redeeming virtue. And we urge the court to affirm that prohibitory injunction by the district court. Thank you, counsel. Thank you. For your rebuttal. Mr. Waxman, let me ask you a question. Why don't we add three minutes on to equalize the time? Very good. I'm going to ask a question. Speak fast. Okay. Coming on the airplane yesterday, I read the New York Times on my iPad, and I can't bring it up again. But my recollection of that article was that the NCAA, I think it was the FSB part of it, passed a rule recently that said, now we can pay our recruits, and it was a vote of 78 to 1, Boston College voting against it, all the other schools voting in favor of it. Now we can pay, this is my recollection of it, our athletes the full cost of education. And the full cost of education, not hard to determine apparently, because the Department of Education has what it actually costs to go to specific schools. Can you bring me up to date on that, if you know, number one? And number two, how does that differ, as Judge Bybee said, asked earlier, how does that differ from what Judge Wilkins imposed on that aspect of her relief? So I wasn't reading the New York Times yesterday on my iPad or otherwise, so I'm not able to, I may be wrong, the general counsel of the NCAA is here. So what the NCAA did originally, before the trial court ruled in this case, there had long been a request by the so-called FBS power conferences to raise the cap from GIA to, quote, COA. COA is not a number that the government fixes, but the Department of Education has established the categories, those categories of expenses that are COA and those that aren't. And before the voted to allow the five power conferences to grant their request to be able to pay up to COA. And I believe what was reported yesterday was a decision to permit all schools, not just the, you know, the five power football conferences, to do the same. And I think this, your point underscores something that I think has been troubling the court and I think may have been a little bit obscured in the argument, which is to the extent that we are talking about a decision of what level of education, what level of educational expenses to reimburse. I think it's important, first of all, my friend says, well, not all amateur leagues require that. And that's true. It is a condition of eligibility of this league that you be a student. If the little league said, well, you know, anybody who plays in the little league is not only to get their expenses, but we're going to pay all of their college tuition when they go to college, that would violate the little league's rules because it is not a reimbursement of the expenses of participation. This is because it is a condition of eligibility that you be a student advancing toward a degree. And the extent to which this, I think, does go to Chief Judge Thomas's question about qualitative versus quantitative, you know, to the extent that all the least restrictive alternative were about was moving from GIA to COA. It really does demonstrate, I think, quite clearly that the less restrictive alternative is not substantially less restrictive. We're talking about whether to include laundry expenses and, you know, certain other things, but not other expenses that some or all students may feel are necessary. And that is a decision that the NCAA must have ample latitude to define. And the problem with... I think you'd have to concede, at least given the NCAA's action, that increasing the allowable compensation to cost of attendance does not violate the spirit of amateurism. No, and the NCAA has found that it does, and the NCAA defines this product. The problem with the district judge's injunction is twofold, but the first one is it is not an injunction that says, you know, schools have to be able to compete up to COA. It says schools have to be able to compete to provide revenue from a specific commercial source to students, and that is the antithesis of amateur, quote, compensation. There is no amateur league that allows someone to receive up to any amount, you know, a percentage of the, you know, team posters or team teddy bears or else. And so it's the character of the rule that she applied at the plaintiff's request. The other problem with it is, as I've said before, it is not a function, and it can't be a function of antitrust courts to say, well, there's a challenge to this price cap. I think the price cap should go up a little bit. I've heard you say a couple of times now that the district court's requires payment out of a particular fund, and I don't see that in the district court's permanent injunction order any place. I believe, I don't have the injunction in front of me, but her order plainly is that the schools have to be permitted to offer, if they wish, a share of the commercial nil revenue, assuming any exists, up to the full cost of attendance. And that is an order that the NCAA not prohibit the receipt of specific commercial revenues for athletes. I see now the language in paragraph B of paragraph 1B in the order, but does that mean that it has to come out of a particular fund? Well, does that mean the NCAA has to say, well, the nil revenues this year weren't so great to cover all of this, so you don't get that this year? I'm a little puzzled by how that's enforceable. I am a little puzzled about how it's enforceable either. And in fact, if you look back at the, I think we've quoted it in our brief, the testimony of their expert, Professor Noll, Dr. Noll, he said, look, I have no idea whether these nil rights exist or not, but that's not relevant because whether they exist or not, under this rule, the schools will be able to offer up to this amount and that's more competition, that's better pay. I mean, it seems to me, I didn't, I guess I read it more the way Judge Bivey did, which is there was a difference between the rationale for the antitrust finding based on the nil value as opposed to the remedy, which was, I didn't see specified a source, but I could be wrong. I'm just looking at page 96 of the court's opinion saying, consistent with the less restrictive alternatives found, the court will enjoin the NCAA from enforcing any rules or bylaws that would prohibit its member schools and conferences from offering their FBS football or Division I basketball recruits a limited share of the revenues generated from the use of their images and likenesses in addition to full grant and aid. It is specifically tied to a commercial revenue source. I don't see that. I'm looking at the, I'm actually now looking at the injunction. I see the language that you've got on page 96 of Judge Wilkins' opinion, but I'm looking at page two of the, of the actual injunction and it becomes a sort of a, a sort of a precursor. It's, it's, it's sort of a, it's sort of in the nature of, because you, this has, this has value, the NCAA is now prohibited from, from not paying up to this amount, but I don't see that it's requiring the NCAA to pay this out of a particular account. Well, if it's not, I mean, if we're talking about now above COA, if it's not, then it's, there's no question that this is pay for play. It's just saying, well, we don't know whether these exist, these rights exist, but you can compete to pay them $5,000 a year. I mean, that, particularly if there are, if it's not linked to nil rights, I mean, there's, there's no possible argument that this isn't pay for play. And to the extent that it is at or under COA as the NCAA now defines COA, the injunction is wholly inappropriate because it doesn't meet the Zenith standard for the issuance of an injunction, since before she ever issued this injunction, the NCAA had already determined that schools could offer up to COA, and therefore it doesn't meet the Zenith requisite for the issuance of an antitrust injunction. I do want to just, I, I realize that my time is over, but I did want to just correct a few things that my friend said. First of all, that it is, it is wrong, it is incorrect that the district judge in this case did not find that there were pro-competitive benefits. In fact, we think that she was too grudging in her finding of pro-competitive benefits because she found that there was a benefit of integration of the student athletes with non-athletes. She found, she, she understated amateurism because on amateurism, she only looked at the effect on fans, and that was the test, the $5,000 testimony from the former chief of CBS Sports. But as the Supreme Court admonished, it, the rules defining and protecting amateurism are pro-competitive not just for fans, but for the athletes as well, in the sense that it provides them with a different model, a model that 500,000 young men and women every year choose to embrace rather than going to a professional model. And really what, since we think she, she got to step three, so she had to find pro-competitive benefits. She erred in the less restrictive alternative because it changed the nature of the product, and it was certainly not substantially less restrictive or consistent with the objective. But in order for her to go to step three, she, she held that the pro-competitive benefits outweighed the anti-competitive effects to the point that above some number, the rules as a whole were pro-competitive. And, you know, I think it's pretty back, letter law that if the plaintiff, in that situation, if the plaintiff doesn't come forward with a less restrictive alternative that is valid in the law, the choice for a court is the current rules or no rules. And as to that, I suggest that the district judge was under no illusions about how that comes out, nor should this court. You are over your time, but I think Judge Crest has one final question. I just want to correct the record in that I do know the difference between the FSB and the FBS. FSB being the Russian Secret Service. Gee, I hope I knew that. Thank you. But I did say FSB instead of FBS. It's a slip of tongue. I've been to Russia too often, I guess. Thank you all for your evidence, and I want to thank, I know, some of the authors of the amicus briefs from the audience. Thank you very much. It's a, they were very well done and very helpful to the court, and we will be in recess.
judges: Quist, Thomas, Bybee